**IN THE UNITED STATES DISTRICT COURT**
**FOR THE NORTHERN DISTRICT OF IOWA**
**WESTERN DIVISION**

WILLIAM EUGENE LEVENTHAL,

       Plaintiff,

vs.

SGT. DANIEL SCHAFFER,

       Defendant.

No. C 07-4059-MWB

**MEMORANDUM OPINION AND
ORDER REGARDING BENCH
TRIAL ON THE MERITS**

_____

**TABLE OF CONTENTS**

*I.* **INTRODUCTION** . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 2
   *A. Procedural History* . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 2
   *B. Findings* . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 5
      *1. Applicable standards* . . . . . . . . . . . . . . . . . . . . . . . . . . . . 5
      *2. Findings of fact* . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 5
         *a. Incidents during RAGBRAI 2005* . . . . . . . . . . . . . . . 6
         *b. Leventhal's interaction with Schaffer* . . . . . . . . . . . . 8
         *c. Eye witnesses to Leventhal's arrest* . . . . . . . . . . . . . 11

*II.* **CONCLUSIONS OF LAW** . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 13
   *A. Leventhal's Unlawful Arrest Claim* . . . . . . . . . . . . . . . . . . . . . 13
      *1. Assault* . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 15
      *2. Disorderly conduct* . . . . . . . . . . . . . . . . . . . . . . . . . . . 17
   *B. Qualified Immunity* . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 24

*III.* **REMEDIES** . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 25

*IV.* **CONCLUSION** . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 26

As this case shows, the Register's Annual Great Bicycle Ride Across Iowa (RAGBRAI) is not just a week of fun, unlimited food on a stick, furious peddling, and beautiful Iowa scenery. It is also a microcosm of social interaction. Events on RAGBRAI 2005 led to plaintiff William Eugene Leventhal's 42 U.S.C. § 1983 action for unlawful arrest, ultimately resulting in a three-day bench trial against defendant Sergeant Daniel Schaffer.

## I. INTRODUCTION

### A. Procedural History

Plaintiff William Eugene Leventhal, filed this *pro se* civil action for damages, pursuant to 42 U.S.C. § 1983 and the Iowa Tort Claims Act (ITCA), IOWA CODE CH. 669, by filing a complaint (docket no. 1) against defendant Sergeant Daniel Schaffer, defendant Lieutenant Jeff Ritzman, and defendant Unknown Employees of the Iowa State Patrol (collectively, the defendants), on July 27, 2007. Leventhal claims Schaffer unlawfully arrested him for disorderly conduct under IOWA CODE § 723.4(3), and that Schaffer used excessive force in handcuffing his wrists, during RAGBRAI on July 29, 2005. Leventhal claims Lieutenant Ritzman, as well as possibly other unknown employees of the Iowa State Patrol, condoned and endorsed defendant Schaffer's alleged illegal actions. Leventhal sued the defendants in their official and individual capacities, alleged damages in the amount of $63,000, and requested attorney fees under 42 U.S.C. § 1988.

On September 27, 2007, the defendants filed a Motion to Dismiss (docket no. 7) pursuant to Rule 12(b)(6) of the Federal Rules of Civil Procedure, which Leventhal resisted. I granted the motion in part and denied it in part, leaving Leventhal with a §

1983 claim[1] against Schaffer in his individual capacity and the ITCA claims against the defendants in their individual capacities—all other claims were dismissed. On January 14, 2008, the defendants filed an Answer (docket no. 15) to Leventhal's Complaint, generally denying all the allegations of wrongdoing therein, and asserting that Schaffer is entitled to qualified immunity.

The defendants filed their Motion for Summary Judgment (docket no. 23) on August 29, 2008, requesting that I grant summary judgment in favor of the defendants on the federal claims because Schaffer had probable cause to arrest Leventhal, his use of handcuffs was not unreasonable, and Schaffer was entitled to qualified immunity. In addition, the defendants alleged both Lieutenant Ritzman and Schaffer were entitled to judgment as a matter of law on the ITCA claims because Leventhal had not exhausted administrative remedies for filing a claim under state law. Leventhal filed his resistance (docket no. 35) to the defendants' Motion for Summary Judgment on October 17, 2008. On March 9, 2009, Leventhal also filed an untimely demand for a jury trial. (docket no. 54). The defendants moved to strike the demand on March 11, 2009. (docket no. 55).

In my March 24, 2009, ruling (docket no. 57) on defendants' Motion for Summary Judgment and Motion to Strike Jury Demand, I denied Leventhal's request for a jury trial, and in effect, granted defendants' Motion to Strike the Jury Demand. Moreover, I granted defendants' Motion for Summary Judgment as to Leventhal's 42 U.S.C. § 1983 claim against Schaffer for excessive force, because there was no evidence of an actual injury resulting from the handcuffs, and Schaffer's method of handcuffing and transporting Leventhal was reasonable. Additionally, I granted defendants' Motion for Summary

---

[1] Leventhal's § 1983 claim encompasses both the alleged unlawful arrest and the alleged excessive force claims.

Judgment concerning Leventhal's ITCA claims, because Leventhal failed to exhaust his administrative remedies before filing suit. *See* IOWA CODE § 669.5(1). As a result, the only claim remaining before me was Leventhal's 42 U.S.C. § 1983 claim for unlawful arrest under the Fourth Amendment to the United States Constitution, and the issue of whether Schaffer was entitled to qualified immunity. On April 8, 2009, Schaffer appealed (docket no. 59) my decision to deny his claim of qualified immunity and to deny his Summary Judgment Motion as to Leventhal's 42 U.S.C. § 1983 claim for unlawful arrest. Leventhal cross appealed (docket no. 65) on April 14, 2009, my decision to grant defendants' Motion for Summary Judgment as to Leventhal's 42 U.S.C. § 1983 claim against Schaffer for excessive force, and my decision to grant defendants' Motion for Summary Judgment on Leventhal's ITCA claims. On February 17, 2010, the United States Court of Appeals for the Eighth Circuit, affirmed my summary judgment decision. (docket no. 74).

Consequently, I held a three-day bench trial on July 26-28, 2010, to determine whether Leventhal was entitled to damages for his remaining claim of unlawful arrest pursuant to 42 U.S.C. § 1983, or if this claim should be dismissed because Schaffer was entitled to qualified immunity. At trial, Leventhal represented himself *pro se*. Schaffer was represented by Jeffrey C. Peterzalek, Assistant Attorney General for the State of Iowa. After the parties' well prepared and effective presentation of evidence, I find that this case is now ripe for disposition.

## B.  Findings

### 1.  Applicable standards

Rule 52 of the Federal Rules of Civil Procedure provides, "In all actions tried upon the facts without a jury or with an advisory jury, the court shall find the facts specially and state separately its conclusions of law thereon. . . ." FED. R. CIV. P. 52(a).  A court may then enter judgment.  FED. R. CIV. P. 58.  In reviewing a district court's order entering judgment after a bench trial, the court of appeals reviews the district court's factual findings for clear error and reviews its legal conclusions *de novo*.  FED. R. CIV. P. 52(a); *Speer v. City of Wynne*, Ark., 276 F.3d 980, 984-85 (8th Cir. 2002).  "Under this standard, [the Eighth Circuit Court of Appeals] overturn[s] a factual finding only if it is not supported by substantial evidence in the record, if the finding is based on an erroneous view of the law, or if [the appellate court is] left with the definite and firm conviction that an error has been made." *Estate of Davis v. Delo*, 115 F.3d 1388, 1393-94 (8th Cir. 1997).  In addition, a reviewing court gives due regard to the opportunity of the district court to judge the credibility of the witnesses.  *Id.*; FED. R. CIV. P. 52(a).

### 2.  Findings of fact

The parties do not dispute the large majority of factual matters underlying this case. Nonetheless, I will not distinguish between the facts to which the parties have stipulated and the facts that require me to resolve conflicting testimony.  I note, however, that most of the conflicting testimony between Leventhal and Schaffer pertains to the sequence of events that occurred immediately prior to Leventhal's arrest.

### a.     Incidents during RAGBRAI 2005

Every year, RAGBRAI attracts over 20,000 bicycle riders from all 50 states and many foreign countries for a memorable trip across the great State of Iowa. This rolling celebration is "the oldest, largest and longest bicycle touring event in the world." RAGBRAI, http://ragbrai.com (last visited September 9, 2010). In 1985, Leventhal first participated in RAGBRAI after being invited by a friend and past coworker. Leventhal enjoyed RAGBRAI so much that he came back to Iowa nineteen more times to pedal across the state. Leventhal always had positive experiences with RAGBRAI, but after his nineteenth tour in 2005, he swore he would never come back.

In 2005, Leventhal traveled from his home town of Montgomery, Alabama, to Iowa for his nineteenth RAGBRAI. During this RAGBRAI, Leventhal engaged in several heated exchanges with a RAGBRAI team called the "Bad Boys." The "Bad Boys" were known for partying along the bicycle route and their distinctive, fully stocked, alcohol rack located on the back of their bikes. Leventhal had originally been a member of the "Bad Boys" team, but their friendship dissolved after an altercation many years prior when some members of the "Bad Boys" team jokingly threatened to "butt fuck" Leventhal. Confrontations escalated on July 28, 2005, when "Bad Boy" Bill, and two other members of the "Bad Boys" team, threw ice water on Leventhal when he was taking a nap along the bicycle route. At a bar later that day, Leventhal confronted Bill, Mike, and seven other members of the "Bad Boys" team for the purpose of telling them to stop harassing him and his desire to have the team apologize. The conversation lasted less than a minute before Leventhal and Bill were on the verge of coming to blows. An employee at the bar stepped between the two men and asked Leventhal to leave. Leventhal complied and left, but stood outside the bar yelling profanities at Bill (calling him a "fucking punk") and telling him to come outside and fight him. The entire incident lasted only a few minutes.

Not long after Leventhal had been removed from the bar, he approached Iowa State Patrol Trooper Jonah Grier,[2] and told him the background that led to the confrontation with "Bad Boy" Bill. Another Trooper, Mikel Yauk,[3] was present for a portion of Leventhal's thirty minute conversation with Trooper Grier. Leventhal stressed that he just wanted the harassment to stop. Trooper Grier agreed to wait with Leventhal for Bill and the other members of the "Bad Boys," so they could all talk and resolve the matter. However, after waiting ninety minutes for the "Bad Boys," who never showed, Leventhal decided to leave Troopers Grier and Yauk and continue along the route. Trooper Grier relayed this information to Schaffer,[4] and Schaffer stated that he would try to make contact with the individuals Leventhal was having problems with.

On the morning of July 29, 2005, Leventhal approached Trooper Grier and asked if he had made contact with the "Bad Boys." Trooper Grier stated that he had not and that he believed Schaffer was in the process of trying to talk to them. At this time, Leventhal's demeanor was calm and there were no issues at hand. Leventhal subsequently learned that the members of team "Bad Boys" were in another bar along the RAGBRAI route in or near Provotin, Iowa.

---

[2] Trooper Jonah Grier, Trooper Mikel Yauk, and Sergeant Schaffer were on duty with the Iowa State Patrol to provide security for RAGBRAI. Trooper Grier has been with the Iowa State Patrol for ten years.

[3] Trooper Yauk has been with the Iowa State Patrol for eleven years.

[4] Sergeant Schaffer currently has 33 years of experience in law enforcement, 22 years are with the Iowa State Patrol.

### b.    *Leventhal's interaction with Schaffer*

After traveling to the bar in Provotin and recognizing bikes owned by members of team "Bad Boys," Leventhal flagged down Schaffer as he was driving by in his patrol car. Leventhal immediately told Schaffer about the previous day's conflict with the "Bad Boys," and asked Schaffer to talk to the "Bad Boys" to see if he could get the harassment to stop.  Schaffer told Leventhal that even if Bill or someone else put their hands on him or took a swing at him, under Iowa law, he could not defend himself; he would have to walk away or he could be arrested.  Leventhal responded that if someone put their hands on him, he was going to defend himself.  Schaffer became uncomfortable with Leventhal's demeanor, as Leventhal became visibly upset, increasingly angry, loud, and profane. Schaffer's impression was that Leventhal was enraged and "on the verge of losing it." Schaffer told Leventhal to settle down, and reminded Leventhal that Leventhal had asked for his help and that he was not Leventhal's problem.  In an attempt to resolve the situation, Schaffer asked Leventhal if he wished to press charges against the "Bad Boys." Leventhal calmed down, and told Schaffer he did not want to press charges.  At that point Schaffer believed he had heard enough, cut the conversation off, and told Leventhal he would speak to the "Bad Boys."

Schaffer then entered the bar and spoke to Bill and Mike, the two specific "Bad Boys" Leventhal had mentioned to him as being problematic.  Schaffer was told that Leventhal had confronted Bill and Mike at the bar and became very abusive.  They mentioned that, in fact, it was Leventhal who had to be removed from the bar by the bar staff, which was news to Schaffer.  Bill and Mike assured Schaffer that Leventhal was the cause of any disturbance and that he seemed to be a troubled individual.  They stated to Schaffer that they did not wish to have any contact with Leventhal and that they would remain out of contact with him.  Bill and Mike expressed concern for their safety because

of Leventhal's behavior. Schaffer advised them to contact him if they had any problems or to dial 911.

Later that afternoon in Spillville, Iowa, Leventhal again approached Trooper Grier and asked if anything had been done about the "Bad Boys." Trooper Grier responded that he did not have any information for Leventhal, because he had not spoken to the "Bad Boys." However, if Leventhal could wait until Schaffer arrived he would be able to fill Leventhal in on the situation. After this explanation, Leventhal expressed frustration with Trooper Grier, because Grier did not have any new information for him, and Leventhal felt that the situation had yet to be resolved. Leventhal left Trooper Grier and went to talk to some friends standing outside a nearby restaurant.

Shortly after Trooper Grier's conversation with Leventhal, Schaffer pulled into the parking lot where Grier was standing and asked if Grier had seen Leventhal. Trooper Grier stated he had just spoken to Leventhal and indicated where Leventhal was located. Schaffer drove over to Leventhal, and called Leventhal to his patrol car. As Leventhal approached, Schaffer remained in his patrol car, and rolled down his driver's side window so that he could speak with Leventhal. Schaffer told Leventhal that he had talked to the members of team "Bad Boys," who maintained Leventhal was "the bad guy" who started the altercation at the bar. Schaffer pointed out that Leventhal had failed to tell him the whole story and that he was the one ejected from the bar after the confrontation the night before. Leventhal responded that Schaffer had stopped him before he had a chance to finish his account of the incident. Leventhal became angry, and told Schaffer not to call him a "fucking liar." It upset Leventhal that Schaffer appeared to be taking the side of the members of team "Bad Boys," who Leventhal maintained were liars. Schaffer warned Leventhal not to raise his voice, and Leventhal responded that he could raise his voice and

that he didn't like being called a liar. Despite Schaffer's warning, Leventhal's temper, profanities, and yelling continued to escalate.

At this point, Schaffer thought Leventhal was a potential threat to his safety because Leventhal was "so enraged." While Leventhal did not make any aggressive movements toward Schaffer while he was seated in his patrol car, Schaffer believed Leventhal's "facial expression . . . appeared as though [he was] becoming incensed and enraged." In Schaffer's experience, people who "are unable to control their emotions become. . . combative, often become flush in the face, they're pensive, their body will tremble with anger, and [Schaffer has] seen that any number of times before assaults have occurred." Schaffer felt very vulnerable and unsafe while seated in his patrol car. He thought that from an officer safety standpoint, he was tactically better off exiting his squad car to be able to face the potential threat on his feet. Of course, if Schaffer really felt threatened, he could have just driven off or called for backup.

At trial, Leventhal sought to paint the picture that Schaffer actually told Leventhal he was under arrest before Schaffer exited his patrol car, and that the reason for the arrest was simply because Schaffer couldn't handle a citizen questioning his judgment, raising his voice, and using profane language. I, however, was not persuaded by this depiction, not least because of Trooper Grier's, Trooper Yauk's, and Schaffer's explanation that arresting someone before stepping out of the patrol car would be inconsistent with police training and procedure. Quite contrary to Leventhal's depiction of the incident, I find that Schaffer did not want to be immobilized in his vehicle should an altercation occur.

As Schaffer stepped out of his patrol car, he did not believe Leventhal had met any elements of a crime, meaning an arrest situation. However, shortly thereafter, Leventhal yelled comments like, "You don't intimidate me! Go ahead, fucking arrest me!" As Leventhal moved towards Schaffer in a quick manner, he raised his hand and pointed his

finger in Schaffer's face. Leventhal's hand was so close to Schaffer's face, Schaffer just reached up and grabbed it, announced that Leventhal was under arrest for disorderly conduct, and escorted Leventhal to the patrol car. Leventhal was driven by Schaffer to Decorah, Iowa, where Leventhal was booked for disorderly conduct, under IOWA CODE § 723.4(3). On the ride to Decorah, Leventhal was calm and respectful, and Schaffer found their conversation interesting. Leventhal posted bail and was released later that day.

The disorderly conduct charge was eventually dismissed pursuant to a deferred prosecution agreement. The entire reason Schaffer effected the arrest was the manner in which Leventhal was acting while making aggressive gestures.

### c.    Eye witnesses to Leventhal's arrest

Eye witness testimony that I find credible clarifies the circumstances of Leventhal's arrest. Troopers Grier and Yauk observed the arrest from approximately twenty to thirty feet away. Although the troopers could not hear everything said between Leventhal and Schaffer, Leventhal's gestures, tone of voice, physical demeanor, and expressions, alerted the officers that Schaffer's personal safety was threatened. Trooper Grier testified that "within a short period of time it became pretty clear that Leventhal became a little more upset. . . . He started to raise his voice and began cussing, his demeanor changed pretty rapidly. I could tell that he wasn't happy with the conversation or happy with what was being said." Trooper Grier was concerned for the safety of Schaffer, "just because of the simple fact he was sitting in his car and Leventhal was standing outside the window. He was in a somewhat confined space and not able to respond in any way." Trooper Grier decided to provide any assistance that he could and "to try to calm Leventhal down." Trooper Grier approached the scene "at a fairly quick walk. Just to get there as fast as [he] could."

As Trooper Grier hastened towards Schaffer and Leventhal, he observed that Leventhal was very close to the driver's side car door. Schaffer motioned for Leventhal to step back away from his car as he was trying to get out. Leventhal stepped back and Schaffer then exited his car and shut the door behind him. After that, Leventhal became even more upset. He started to gesture with his hand by pointing his finger towards Schaffer in an aggressive manner, raise his voice, and rapidly close in on the distance between himself and Schaffer. Significantly, Trooper Grier noted that as a law enforcement officer, he would consider such actions by Leventhal as aggressive and threatening. Trooper Grier testified that "[Leventhal] was just escalating to the point where I felt I needed to be there for Schaffer's safety." In the end, Trooper Grier observed Schaffer grab the hand of Leventhal that was getting closer to Schaffer's face, and place it behind Leventhal's back. Leventhal was handcuffed and placed into the patrol car by Schaffer, while Trooper Grier took custody of Leventhal's bicycle.

Trooper Yauk's testimony at trial reaffirmed Trooper Grier's and Schaffer's accounts of the arrest. From across the street, approximately twenty to thirty feet away, Trooper Yauk first noticed Leventhal conversing with Schaffer in an aggressive manner. Trooper Yauk testified that he "could tell that Leventhal's body was poised in an aggressive manner where his body was stiff, the way he was speaking to Schaffer was very loud, very fast, and he also had a finger raised to Schaffer in his face." According to Trooper Yauk's observations, Leventhal's hand was twelve inches or less from Schaffer's face. As soon as Trooper Yauk saw the body language, loud verbiage, and the shaking of the finger, "[he] just knew that [he] had to be over closer to that situation." By the time Trooper Yauk arrived at the scene, he had observed Schaffer grab the hand that Leventhal was shaking in front of his face, and handcuff Leventhal. Specifically, Trooper Yauk perceived Leventhal's actions as threatening due to the fact Leventhal closed the distance

so closely between himself and Schaffer, in addition to the verbiage and finger shaking. Body language speaks volumes to an officer; as Trooper Yauk put it, "[i]t speaks louder than words."

## II.  CONCLUSIONS OF LAW
(Including additional findings of fact)

I will begin my analysis of the merits of Leventhal's remaining 42 U.S.C. § 1983 claim against Schaffer for unlawful arrest, and will then address whether Schaffer is entitled to qualified immunity.

### A.  Leventhal's Unlawful Arrest Claim

Leventhal's unlawful arrest claim is pursuant to 42 U.S.C. § 1983, which states:

> Every person who, under color of any statute, ordinance, regulation, custom, or usage, of any State or Territory or the District of Columbia, subjects, or causes to be subjected, any citizen of the United States or other person within the jurisdiction thereof to the deprivation of any rights, privileges, or immunities secured by the Constitution and laws, shall be liable to the party injured in an action at law, suit in equity, or other proper proceeding for redress, except that in any action brought against a judicial officer for an act or omission taken in such officer's judicial capacity, injunctive relief shall not be granted unless a declaratory decree was violated or declaratory relief was unavailable. For the purposes of this section, any Act of Congress applicable exclusively to the District of Columbia shall be considered to be a statute of the District of Columbia.

In a § 1983 action, the plaintiff must prove:  (1) that "the conduct complained of was committed by a person acting under color of state law;" and, (2) that the "conduct deprived a person of rights, privileges, or immunities secured by the Constitution or laws

of the United States." *Parratt v. Taylor*, 451 U.S. 527, 535 (1981), overruled on other grounds by *Daniels v. Williams*, 474 U.S. 327 (1986). There is no dispute about the first element: Schaffer, as a state law enforcement officer, acted under color of state law, specifically, arresting Leventhal for "disorderly conduct" under Iowa Code § 723.4(3).

Regarding the second element, Leventhal argues that he was deprived of his constitutional right under the Fourth Amendment to the U.S. Constitution to be free from unreasonable seizure. The Fourth Amendment protects "[t]he right of the people to be secure in their persons, houses, papers, and effects, against unreasonable searches and seizures." U.S. CONST. amend. IV. In conformity with the rule at common law, a warrantless arrest by a law officer is only reasonable under the Fourth Amendment where there is probable cause to believe that a criminal offense has been or is being committed. *See United States v. Watson*, 423 U.S. 411, 417-424 (1976)*; Brinegar v. United States*, 338 U.S. 160, 175-176 (1949); *Amrine v. Brooks*, 522 F.3d 823 (8th Cir. 2008). Whether probable cause exists depends upon the reasonable conclusion to be drawn from the facts known to the arresting officer at the time of the arrest. *See Maryland v. Pringle*, 540 U.S. 366, 371 (2003).

The Eighth Circuit Court of Appeals has outlined requirements for determining probable cause, as follows:

> Probable cause exists when the totality of the circumstances shows that a prudent person would believe that the arrestee has committed a crime. *See Illinois v. Gates*, 462 U.S. 213, 238-39, 103 S. Ct. 2317, 76 L. Ed. 2d 527 (1983); *United States v. Washington*, 109 F.3d 459, 465 (8th Cir. 1997). Exculpatory evidence is therefore relevant to whether an officer has probable cause. *Kuehl v. Burtis*, 173 F.3d 646, 650 (8th Cir. 1999). Officers are not required to conduct a "mini-trial" before arrest, but probable cause "does not exist

> when a 'minimal further investigation' would have exonerated
> the suspect."

*Amrine*, 522 F.3d at 832; *United States v. Quiroga*, 554 F.3d 1150, 1154 (8th Cir. 2009).

Schaffer argues that he had probable cause to arrest Leventhal for disorderly conduct, in violation of IOWA CODE § 723.4(3), or, if not for that offense, then for assault, under IOWA CODE § 708.1. I will consider in turn, whether Schaffer had probable cause to arrest Leventhal for either offense.

### 1. Assault

In pertinent part, IOWA CODE § 708.1 provides that,

> [A] person commits an assault when, without justification, the
> person does any of the following:
> (1) Any act which is intended to cause pain or injury to, or
> which is intended to result in physical contact which will be
> insulting or offensive to another, coupled with the apparent
> ability to execute the act.
> (2) Any act which is intended to place another in fear of
> immediate physical contact which will be painful, injurious,
> insulting, or offensive, coupled with the apparent ability to
> execute the act.

Schaffer had probable cause to arrest Leventhal if he reasonably believed Leventhal had committed assault. *Quiroga*, 554 F.3d at 1154. Schaffer believed that Leventhal had committed both the crimes of assault and disorderly conduct, and testified at trial, "I actually believe under the Iowa State constitution [sic] of assault this may have met the elements of that." Trial Tr. 88, July 27, 2010. However, Schaffer decided to charge Leventhal with only the disorderly conduct statute because of its lesser consequence to Leventhal as compared to assaulting a police officer. When Schaffer was asked by me why he selected disorderly conduct rather than assault, Schaffer responded, "I guess I look at an assault even though it's a simple misdemeanor it carries a little more onus if you

assaulted a police officer. You assaulted someone. Rather than maybe just you know you were behaving badly." Trial Tr. 84, July 27, 2010.

At trial, when questioned by Leventhal concerning the reasons for the arrest, Schaffer testified:

> A. I took the words you were using as I was getting out of my car to be threatening.
> Q. What words were those?
> A. Go ahead and fucking arrest me.
> Q. Those were threatening words?
> A. Coupled with everything else that was happening at that very moment, I felt threatened.

Trial Tr. 45, July 27, 2010. Numerous times at trial, Schaffer testified that he was concerned for his safety: "[A]t that point you had moved in so fast and had made that motion towards my face, it was—I was in fear for my own safety at that point." Trial Tr. 208, July 26, 2010.; "But the reason I effected the arrest was the manner in which you were acting and when you made that gesture and that motion in close with your body, to be able to point that finger, I felt very threatened and vulnerable at that time and I thought there was an imminent threat to my safety." Trial Tr. 210, July 26, 2010.; "Because at the moment of the arrest at the moment I decided to arrest you, I felt imminently threatened by you. I thought you intended to do me harm, sir." Trial Tr. 233-234, July 26, 2010. Troopers Grier and Yauk also testified that they viewed Leventhal's demeanor, loud verbiage, and body language as aggressive and threatening, and were concerned for Schaffer's safety. Trial Tr. 50-51, July 26, 2010; Trial Tr. 200-201, July 27, 2010.

I recognize the sincere testimony on behalf of Schaffer and Troopers Yauk and Grier, but as an armchair quarterback, find it incredible that a 6 ft. 6 in. tall, approximately 230 lbs., armed, trained police officer, would feel threatened by a slender, middle-aged, 5 ft. 9 in. tall, individual, cursing and wagging his finger. A police officer

16

should be able to tell the difference between an individual who is simply upset and talking with their hands, versus an individual who is attacking. As a result, I do not find probable cause for an assault arrest under IOWA CODE § 708.1, because Leventhal's pointed finger would not have caused a reasonable person to fear "immediate physical contact."

### 2. *Disorderly conduct*

IOWA CODE § 723.4(3), the disorderly conduct statute, prohibits, among other things, "[d]irect[ing] abusive epithets or mak[ing] any threatening gesture which the person knows or reasonably should know is likely to provoke a violent reaction by another." Breaking the statute into two elements, I will address whether Schaffer had probable cause to arrest Leventhal for disorderly conduct because of: (1) abusive epithets; and/or, (2) threatening gestures.

Schaffer had probable cause to arrest Leventhal for disorderly conduct if he reasonably believed Leventhal had committed a crime by "[d]irect[ing] abusive epithets." IOWA CODE § 723.4(3)*; Amrine*, 522 F.3d at 832; *Quiroga*, 554 F.3d at 1154. Regarding abusive epithets, the United States Supreme Court has recognized that it is "often true that one man's vulgarity is another's lyric." *Cohen v. California*, 403 U.S. 15, 25 (1971). However, "the First and Fourteenth Amendments have never been thought to give absolute protection to every individual to speak whenever or wherever he pleases or to use any form of address in any circumstances that he chooses." *Cohen*, 403 U.S. at 19. "Resort to epithets or personal abuse is not in any proper sense communication of information or opinion safeguarded by the Constitution, and its punishment as a criminal act would raise no question under that instrument." *Chaplinsky v. New Hampshire*, 315 U.S. 568, 572

(1942).[5] The United States Supreme Court in *Chaplinsky*, clarified that "fighting words" are not protected under the First Amendment:

> [I]t is well understood that the right of free speech is not absolute at all times and under all circumstances. There are certain well-defined and narrowly limited classes of speech, the prevention and punishment of which has never been thought to raise any Constitutional problem. These include the lewd and obscene, the profane, the libelous, and the insulting or 'fighting' words—those which by their very utterance inflict injury or tend to incite an immediate breach of the peace.

*Chaplinsky*, 315 U.S. at 571-572. Ultimately, the United States Supreme Court concluded "the reason why 'fighting words' are categorically excluded from the protection of the First Amendment is not that their content communicates any particular idea, but that their content embodies a particularly intolerable (and socially unnecessary) mode of expressing whatever idea the speaker wishes to convey." *R.A.V. v. City of St. Paul*, 505 U.S. 377, 393 (1992).

The United States Supreme Court has also declared that different standards apply when "fighting words" are addressed to an average citizen versus a uniformed police officer. Concerning average citizens, "[t]he States are free to ban the simple use, without a demonstration of additional justifying circumstances, of so-called 'fighting words,' those personally abusive epithets which, when addressed to the ordinary citizen, are, as a matter of common knowledge, inherently likely to provoke violent reaction." *Cohen*, 403 U.S. at 20. In contrast, the Court has explained that police officers are held to a higher standard than average citizens,

---

[5] In *Chaplinsky*, the United States Supreme Court concluded that "the appellations 'damn racketter' and 'damn Fascist' are epithets likely to provoke the average person to retaliation, and thereby cause a breach of the peace." *Chaplinsky*, 315 U.S. at 574.

> [T]he First Amendment protects a significant amount of verbal criticism and challenge directed at police officers. "Speech is often provocative and challenging. . . [But it] is nevertheless protected against censorship or punishment, unless shown likely to produce a clear and present danger of a serious substantive evil that rises far above public inconvenience, annoyance, or unrest."

*Houston v. Hill*, 482 U.S. 451, 461 (1987) (citing *Terminiello v. Chicago*, 337 U.S. 1, 4 (1949)). The Court in *Houston* further noted, that,

> [I]n a concurring opinion in *Lewis v. City of New Orleans*, 415 U.S. 130, 94 S. Ct. 970 (1974), Justice Powell suggested that even the "fighting words" exception recognized in *Chaplinsky*, might require a narrower application in cases involving words addressed to a police officer, because "a properly trained officer may reasonably be expected to exercise a higher degree of restraint than the average citizen, and thus be less likely to respond belligerently to fighting words."

*Houston*, 482 U.S. at 462.

Numerous cases[6] illuminate what language or conduct amounts to "fighting words" and what is simply a colorful expression of opinion. Cases holding that the language at issue, when addressed to a police officer, was ***not*** "fighting words" are the following: *See Cook v. Bd. of County Comm'rs*, 966 F. Supp. 1049, 1051-53 (D. Kan. 1997) (reversing an arrest for disorderly conduct for giving a parked patrol car the middle finger); *Diehl v. State*, 451 A.2d 116, 121, 122 (Md. 1982) (overturning a disorderly conduct conviction where the defendant shouted to an officer "Fuck you," and, "I know my rights," while

---

[6] I am deeply indebted to Professor Ira P. Robbins and his sagaciously enthralling and scholarly law review article, "Digitus Impudicus: The Middle Finger and the Law," which catalogues all of the cases referenced on pages 20-22. Ira P. Robbins, *Digitus Impudicus: The Middle Finger and the Law*, 41 U.C. Davis L. Rev. 1403 (2008).

noting that it is not clear whether language addressed to a law enforcement officer can constitute fighting words or whether "a different and higher standard applies"); *H.N.P. v. State*, 854 So. 2d 630, 632 (Ala. Crim. App. 2003) (recognizing "[t]he fact that [a police] officer encounters . . . vulgarities with some frequency, and the fact that his training enables him to diffuse a potentially volatile situation without physical retaliation . . . means that words which might provoke a violent response from the average person do not, when addressed to a police officer, amount to 'fighting words'" and finding that giving the middle finger to an officer did not amount to fighting words and was not sufficient to support a disorderly conduct conviction); *City of Bismarck v. Schoppert*, 469 N.W.2d 808, 813 (N.D. 1991) (reversing a disorderly conduct conviction where "testimony confirmed the notion . . . that those well-trained and experienced police officers were able to hear Schoppert's vulgar and abusive speech as part of their duties"); *Duran v. City of Douglas*, 904 F.2d 1372, 1378 (9th Cir. 1990) (declaring that police officers may resent, but must endure, insulting words and gestures directed against them); *Nichols v. Chacon*, 110 F. Supp. 2d 1099, 1107 (W.D. Ark. 2000) (stating that officers must have a "thicker skin" than members of the general public, "may not exercise their authority for personal motives, particularly in response to real or perceived slights to their dignity," and, must respect an individual's right to question and challenge an officer); *Kerman v. City of New York*, 261 F.3d 229, 242 (2d Cir. 2001) (protecting the right to "criticize the police without reprisal"); *Webster v. City of New York,* 333 F. Supp. 2d 184, 202 (S.D.N.Y. 2004) (holding that "criticism of the police officers' actions" is protected speech); MODEL PENAL CODE § 250.2 cmt. 7(iii) (1962) (recommending "insults that merely disturb the policeman's feelings" do not apply to disorderly conduct statutes); *Spier v. Elaesser*, 267 F. Supp. 2d 806, 811 (S.D. Ohio 2003) (holding that officers violated Spier's First Amendment rights when they arrested him for chanting, "two, four, six,

eight, fuck the police state"); *Sweatt v. Bailey*, 876 F. Supp. 1571, 1580 (M.D. Ala. 1995) (concluding that calling police officer "an ass" does not amount to fighting words); *Ware v. City & County of Denver*, 511 P.2d 475, 475 (Colo. 1973) (holding that replying "Fuck you" to a police officer did not amount to fighting words); *People v. Stephen*, 581 N.Y.S.2d 981, 985-86 (N.Y. Crim. Ct. 1992) (holding that use of offensive language and groping of one's genitals at an officer were protected speech); *See State v. Creasy*, 885 S.W.2d 829, 831 (Tenn. Crim. App. 1994) (finding that directing profanities and insults at an officer were not considered fighting words).

In contrast, in the following cases the courts held that the language or conduct involved ***did*** amount to fighting words, and, therefore, was not entitled to protection under the First Amendment: *See State v. Wood*, 679 N.E.2d 735, 735-39 (Ohio Ct. App. 1996) (finding that the defendant committed disorderly conduct after seeking out law enforcement officers and continuing to verbally insult and shoot the bird after being asked to stop. However, the court recognized that officers should expect to encounter "some degree of verbal abuse and that therefore the standard for fighting words is heightened"); *State v. Groves*, 363 N.W.2d 507, 510 (Neb. 19. 19. 19. 19. 19. 19. 1985) (finding that calling an officer "fuckhead" and "motherfucker" constituted fighting words); *Duncan v. United States*, 219 A.2d 110, 112-13 (D.C. 1966) (recognizing that an officer "does not lose his human nature simply because he wears a star"); *City of St. Paul v. Morris*, 104 N.W.2d 902, 903 (Minn. 1960) (stating "[w]hile it is obvious that not every abusive epithet directed toward police officers would be sufficiently disturbing or provocative to justify arrest for disorderly conduct, there is no sound reason why officers must be subjected to indignities such as present here (calling officer a "white mother-fucker"), indignities that go far beyond what any other citizen might reasonably be expected to endure."); *Commonwealth v. Kelly*, 758 A.2d 1284, 1288-89 (Pa. Super. Ct. 2000) (recognizing that

"[p]ublic employees, volunteer firefighters and emergency personnel" should not have to tolerate offensive language while serving and protecting the public). These cases guide my analysis of Leventhal's outburst towards Schaffer that led to Leventhal's eventual arrest.

At trial, Leventhal admitted that he told Schaffer not to call him "a fucking liar." Trial Tr. 191, July 26, 2010. Schaffer also testified that Leventhal was "just enraged yelling 'You don't intimidate me. Go ahead and fucking arrest me.' And I remember your finger coming up very close to the end of my nose and at that point I said, 'You are under arrest.'" Trial Tr. 206, July 26, 2010. Significantly, at no time did Leventhal direct his abusive language towards Schaffer by name calling or personal attacks, as in the prior examples where the courts found an arrest for disorderly conduct appropriate. *See Groves*, 363 N.W.2d at 510; *Morris*, 104 N.W.2d at 903; *Kelly*, 758 A.2d at 1288-89. Instead, Leventhal's epithets were mere adjectives or adverbs, describing either himself or the situation at hand. I am doubtful personal verbal attacks would even have amounted to fighting words when directed to a police officer, in light of cases where an officer was: called "an ass," *See Sweatt*, 876 F. Supp. at 1580; given the middle finger, *Cook*, 966 F. Supp. at 1051-53; or told "fuck you,"[7] *Ware*, 511 P.2d at 475. Schaffer conceded at trial that he did not have probable cause to arrest Leventhal merely for his language, "I'm not really sure if you are asking just the words that you used alone rise to the level of an arrest, absolutely not. But coupled with your physical demeanor coupled with your spacial relationship to me coupled with the gestures, you know pointing your hand so close to my

---

[7] There was a dispute over whether Leventhal at the time of the arrest directly said "fuck you" to Schaffer. On the video recording of the arrest of Leventhal (plaintiff's Exhibit 1), Schaffer states that Leventhal said "fuck you" to Schaffer. However, at trial Schaffer clarified that he did not believe Leventhal actually said the words "fuck you."

face, yes, sir I believe that rose to the level of cause for arrest." Trial Tr. 46, July 27, 2010.

While I recognize that private citizens have an obligation to treat law enforcement officials with respect, they also have a constitutional right to verbally oppose or challenge police action. Ultimately, "The freedom of individuals verbally to oppose or challenge police action without thereby risking arrest is one of the principal characteristics by which we distinguish a free nation from a police state." *Houston*, 482 U.S. at 462—463. In sum, I find that Schaffer did not have probable cause to arrest Leventhal for the "abusive epithets" subpart of disorderly conduct, under IOWA CODE § 723.4(3).

I turn now to whether Schaffer had probable cause to arrest Leventhal for disorderly conduct if he reasonably believed Leventhal had committed a crime "by mak[ing] any threatening gesture." IOWA CODE § 723.4(3); *Amrine*, 522 F.3d at 832; *Quiroga*, 554 F.3d at 1154. While an average citizen might have felt threatened by Leventhal's finger pointing and cursing, I once again note the higher expectations demanded for police officers. The United States Supreme Court, referencing the higher standard for police officers in the face of dissidence, recognized "[t]hat a certain amount of expressive disorder not only is inevitable in a society committed to individual freedom, but must itself be protected if that freedom would survive." *Houston*, 482 U.S. at 472. Moreover, in light of the similarity of the elements for assault, under IOWA CODE § 708.1 ("to place another in fear of immediate physical contact"), and disorderly conduct, under IOWA CODE § 723.4(3) ("mak[ing] any threatening gesture"), I find Schaffer lacked probable cause for disorderly conduct for the same reasons he lacked probable cause for assault. A police officer should be able to recognize when a citizen is simply expressing himself. Also, in view of the fact that Troopers Grier and Yauk did not sprint or run to Schaffer's aid supports my decision that Leventhal's arrest was not objectively reasonable. As a result,

23

I do not find probable cause for a disorderly conduct arrest under IOWA CODE § 723.4(3), because a reasonable police officer would not have considered Leventhal's finger pointing as a "threatening gesture."

## B. Qualified Immunity

Notwithstanding my finding that there was not, as a matter of law, probable cause to arrest Leventhal, Leventhal's § 1983 claim is subject to being dismissed if Schaffer is entitled to qualified immunity. *See Murphy v. State of Ark.*, 127 F.3d 750, 755 (8th Cir. 1997). The 8th Circuit Court of Appeals has explained qualified immunity as follows,

> In the wrongful arrest context, officers are entitled to qualified immunity "if they arrest a suspect under the mistaken belief that they have probable cause to do so, provided that the mistake is objectively reasonable."

*Baribeau v. City of Minneapolis*, 596 F.3d 465, 478 (8th Cir. 2010) (citing *Amrine v. Brooks*, 522 F.3d 823, 832 (8th Cir. 2008)). "Qualified immunity protects public officials from § 1983 damage actions if 'their conduct does not violate clearly established statutory or constitutional rights of which a reasonable person would have known.'" *Bradford v. Huckabee*, 394 F.3d 1012, 1015 (8th Cir. 2005) (quoting *Harlow v. Fitzgerald*, 457 U.S. 800, 818 (1982)). The Eighth Circuit Court of Appeals has explained that "[t]he qualified immunity standard gives ample room for mistaken judgments by protecting all but the plainly incompetent or those who knowingly violate the law." *Pace v. City of Des Moines*, 201 F.3d 1050, 1052 (8th Cir. 2000). In other words, I must resolve whether there was "arguable probable cause" for Schaffer to arrest Leventhal. *Baribeau*, 596 F.3d 465 at 478.

Once again, I recognize that I am armchair quarter-backing in my finding that Schaffer lacked probable cause for his arrest of Leventhal for disorderly conduct. Because

Schaffer mistakenly believed he had probable cause to arrest Leventhal for either disorderly conduct or assault, and that this belief was not plainly incompetent or a knowing violation of the law, I find Schaffer had "arguable probable cause" to arrest Leventhal. Furthermore, in light of the corroborative, credible, testimonies of Troopers Grier and Yauk, and just as importantly, their action at the time to support Schaffer, this bolsters my finding that Schaffer had arguable probable cause. Overall, I am sympathetic to Schaffer having to make a split-second decision[8] in the heat of the moment, and grant him qualified immunity.

### III. REMEDIES

Leventhal seeks damages in the amount of $63,000; and, attorney fees under 42 U.S.C. § 1988. I have found that Schaffer is entitled to qualified immunity. Although Leventhal established that Schaffer violated his Fourth Amendment rights, Leventhal did not win his lawsuit because Schaffer had qualified immunity. As a result, Leventhal is not entitled to any damages. Leventhal is not entitled to attorney fees for two reasons: (1) Leventhal is not a prevailing party; and, (2) attorney fees are not available to non-lawyer *pro se* plaintiffs. *See Coleman v. Turner*, 838 F.2d 1004, 1005 (8th Cir. 1988) ("Because appellants were not represented by counsel, they are not entitled to attorney's fees under 42 U.S.C. § 1988." (citing *Davis v. Parratt*, 608 F.2d 717, 718 (8th Cir. 1979))). Therefore, Leventhal's claim for damages; and, attorney fees under § 1988 are dismissed.

---

[8] In the related context of excessive force, the United States Supreme Court has recognized, "[t]he calculus of reasonableness must embody allowance for the fact that police officers are often forced to make split-second judgments-in circumstances that are tense, uncertain, and rapidly evolving-about the amount of force that is necessary in a particular situation." *Graham v. Connor*, 490 U.S. 386, 396-397 (1989); *Greiner v. Champlin*, 27 F.3d 1346, 1354 (1994); *Brandt v. Davis*, 191 F.3d 887, 892 (1999)).

### IV. CONCLUSION

Because Schaffer's actions constitute arguable probable cause, and were not plainly incompetent, or a knowing violation of the law in his arrest of Leventhal, I find in this non-jury trial that Schaffer is entitled to qualified immunity.

THEREFORE, Leventhal's 42 U.S.C. § 1983 claim against Schaffer for unlawful arrest is denied. This case is dismissed in its entirety, and the clerk of court is directed to enter judgment accordingly.

**IT IS SO ORDERED.**

**DATED** this 9th day of September, 2010.

_Mark W. Bennett_

MARK W. BENNETT
U. S. DISTRICT COURT JUDGE
NORTHERN DISTRICT OF IOWA